J-S55014-19 & J-S55015-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.S., BIRTH FATHER | : : : : : : | |
| | : | No. 714 WDA 2019 |

Appeal from the Order Entered April 25, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000271-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.C., BIRTH MOTHER | : : : : : : | |
| | : | No. 715 WDA 2019 |

Appeal from the Order Entered April 25, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000271-2018

BEFORE:   MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                **FILED NOVEMBER 06, 2019**

D.S. (Father) and B.C. (Mother) (collectively, Parents) appeal from the order involuntarily terminating their parental rights to their minor daughter, N.S. (born April 2017) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b) of the Adoption Act.  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The trial court summarized the factual and procedural history of this matter as follows:

[Child] was first brought by her parents to Passavant Hospital [as an infant] for an auricular hematoma in her ear that needed to be drained. [Child] was released from Passavant after treatment that same day, []. Mother and Father brought [Child] back to Passavant two days later when the hematoma refilled, at which time Passavant then sent Mother, Father, and [Child] to Children's Hospital for further examination and treatment.

Upon assessment and admission at Children's Hospital, [Child] was seen by Child Advocacy Center physicians and received a skeletal survey, which documented 24 rib fractures in various stages of healing. Dr. Jennifer Wolford, an expert from the Child Advocacy Center at Children's Hospital who treated [Child], stated that [Child] had the following injuries: a very large hematoma in her ear, a torn frenulum, seven healing fractures on the front of the right ribs, five fractures on the back right ribs, six fractures on the front of the left ribs, and six fractures on the back of the left ribs, and healing fractures on the left tibia and fibula. Dr. Wolford testified that while parents may have initially suggested this was the result of a bone disease, or disorder, the parents never followed through with obtaining any additional testing for any bone diseases or disorder. Furthermore, all of the testing and examination done by the Child Advocacy Center on [Child] failed to provide any evidence that she may have suffered from a bone disease or disorder.

Dr. Wolford testified that [Child] could not have inflicted these injuries upon herself because a baby at her age cannot physically generate the force necessary to tear her mouth, create a large ear hematoma, or break as many ribs as she presented with. Dr. Wolford stated that there is not a single medical disease today that would produce all of these injuries without trauma being involved. Dr. Wolford testified that for such significant trauma to exist in an 8-week old baby would have to be a direct result from physical abuse. Dr. Wolford also testified that [Child] was underweight at the time of the Child Advocacy Center's evaluation, and that this could be due in part to the fact that by having so many rib fractures it would be uncomfortable to eat, or because all of her calories that she was taking in w[ere] going

towards trying to lay down new bone growth.  Finally, Dr. Wolford noted at that time in her evaluation that if [Child] were to be returned to this violent environment that she would be at risk for continued injury and even death.

As a result of the above discussed injuries and assessments, [Child] came to the attention of CYF on May 31, 2017, who then started their investigation.  [Child] remained in the care of Children's Hospital until June 1, 2017.  CYF obtained an Emergency Custody Authorization ("ECA") on June 1, 2017 and [Child] was discharged to her maternal grandparents because of the severity of [Child]'s injuries, and because after an interview with her parents, neither parent could provide CYF with any clear evidence as to how she obtained her injuries.

[Child] remained in the care of her maternal grandparents until June 23, 2017.  CYF moved [Child] due to allegations of domestic violence between the maternal grandparents, as well as allegations that maternal grandparents were allowing Mother in the home for unscheduled visits.  [Child] was placed in a Presley Ridge foster home.  [Child] was adjudicated dependent pursuant to 42 Pa. C.S. § 6302(1) on or about July 21, 2017, at which time the parents stipulated to what the medical testimony would be but not that they caused the injuries, and this [c]ourt ordered [Child] to remain in the Presley Ridge foster home, where she resides to this day.

Trial Court Opinion, 6/20/19, at 4-6 (citations to the record omitted).

On December 31, 2018, CYF filed a petition to involuntarily terminate the parental rights of Mother and Father to Child.  The court conducted a hearing on the petition on April 8, 2019.[1]  At the hearing, CYF presented the testimony of Detective Daniel Honan of the City of Pittsburgh Bureau of Police, who investigated the injuries to Child; Gerald Paris, Jr., Father's juvenile probation officer; Dr. Jennifer Wolford, a doctor at Children's Hospital of

_____

[1] By order dated February 25, 2019, the court appointed KidsVoice as counsel for Child.

Pittsburgh, who treated Child; Officer Sean Stafiej of the Ross Township Police Department, who investigated an incident of domestic violence between Mother and Father; Terry O'Hara, Ph.D., who conducted psychological evaluations of Mother and Father; Kelly Hindman, Father's visitation coach; and Wendy Lyons and Samantha Holtz, CYF caseworkers.  Parents testified on their own behalf.  On April 25, 2019, the court entered an order involuntarily terminating Parents' parental rights to Child.  Parents filed timely notices of appeal and concise statements of errors complained of on appeal.[2]

On appeal, Parents raise the following issues for our review:

> 1.     Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate [Parents'] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?
>
> 2.     Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of [Parents'] parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6.[3]

We review these claims mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate

---

[2] We address Mother's and Father's appeals together for ease of disposition.

[3] The only meaningful difference between Father's issues and Mother's issues is that Father separated his challenge to the court's findings under Section 2511(a) into two issues.  *See* Father's brief at 6-7.

courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

   (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

We first consider whether the trial court abused its discretion by terminating Parents' parental rights pursuant to Section 2511(a)(2).

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Mother argues that the trial court erred in its analysis of Section 2511(a)(2) because she "had positive reports from several service providers, the court's psychological expert, and even the CYF caseworker[,] but was still seen as a risk because Mother would not offer a plausible explanation for the injuries to [Child]." Mother's Brief at 19-20. Mother claims that she does not know how Child was injured, and "therefore will never be able to provide a plausible explanation of how [Child] was injured." *Id.* Mother contends that because she met all of her goals, it was inappropriate for the court to require "Mother to provide this 'last piece'. . . because it placed Mother in the impossible position of requiring her to state that which she did not know." *Id.* at 21.

Similarly, Father argues that he met the goals established by CYF, and termination of his parental rights was improper. Father's Brief at 15-16. Father emphasizes that he attended Child's medical appointments; completed a parenting and visitation program; complied with the terms of his probation; and attended visits. *Id.* at 15-18. Father asserts that the CYF caseworker testified that he met all of the court-ordered goals, and he highlights

testimony that he improved his parenting skills and did well with Child. *Id.* at 16-18. Further, Father points to testimony from his probation officer that Father has matured and progressed. *Id.* at 18-19. Accordingly, Father contends there was insufficient evidence that "repeated and continued incap[a]city, abuse, neglect or refusal exists." *Id.* at 21. Father faults the court for focusing on Parents' failure to attain maturity and acknowledge their role in failing to protect Child. *Id.* at 23-24. Father argues that the testimony showed he had matured, and that he acknowledged Child was abused and that he had a role in failing to protect her. *Id.* Ultimately, Father concludes that the court erred because he met his goals, attained increased maturity, and recognized Child's abuse. *Id.* at 24.

With respect to Section 2511(a), the trial court recounted the testimony presented at the hearing that showed, by and large, that Parents were meeting the goals established by CYF. *See* Trial Court Opinion, 6/20/19, at 10-12. However, the court concluded that termination was appropriate, reasoning at length:

> Here, both Mother and Father have regrettably not remedied the primary condition that led to [Child]'s removal. This [c]ourt finds it unsettling that Mother and Father appear not to have grasped the magnitude of the injuries that brought [Child] to Children's Hospital [as an infant], nor have they ever been able to provide any plausible explanation or insight into how these injuries were sustained while in their parental care. This [c]ourt acknowledges and commends the parents for making progress on other goals; however, there was no competent evidence or testimony presented that Mother and/or Father have made the acknowledgement and recognition necessary to ensure [Child]'s long-term safety.

To be clear, this [c]ourt was not asking that Mother or Father admit criminal liability or take responsibility for something that they did not actively do. Moreover, the fact that Mother entered a no-contest on her Endangering the Welfare of a Child charge and that Father entered an admission on his delinquency Endangering the Welfare of a Child charge did not resolve the issue of recognition or acknowledgement that was needed to ensure safety, as noted by the expert witnesses. Dr. Wolford commented in her testimony that, "I think it's fair to say that we all acknowledge that pleading guilty to different charges in no way is a way to assume there is acknowledgement."

This [c]ourt was transparent throughout the pendency of the case, as reflected in permanency review orders, that remedying this primary condition that led to removal would require some evidence that parents had attained the maturity, insight and/or ability to acknowledge their role in failing to protect [Child] from this level of violence and some plausible explanation for these serious injuries. **See** CYF Exhibit 5, [Permanency Review Order (P.R.O.)] dated October 19, 2017 ("Parents believe [C]hild suffers from brittle bone disease which they are making as the excuse for over 20 rib fractures but even if this were true it would not account for the left ear hematoma. The court has grave concerns for this child's safety and the lack of parental insight as to what brought this child to the court's attention."); **see also** P.R.O. dated February 2, 2018 ("This case remains concerning to the court. While the parents are compliant with attending treatment the court is not convinced that they have gained any insight."); **see also** P.R.O. dated May 2, 2018 ("This case remains concerning to the court. While the parents are compliant with attending treatment the court is not convinced they have gained any insight."); **see also** P.R.O. dated September 26, 2018 ("This court does not believe either parent when they indicate they do not know what happened. This is a huge concern for [Child's] safety."); **see also** P.R.O. dated December 19, 2018 ("Mother testified today that she does not know what happened. This court does not believe either parent when they indicate that they do not know what happened.").

Furthermore, this [c]ourt takes note that at the time of the termination proceeding Mother was 21 years old and Father was 19 years old. In the nearly twenty-three months that [Child] had been in foster care, only Mother had progressed to the point of

receiving unsupervised day visits and Father still had supervised visitation. Our Superior Court has noted that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future." *In the Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The totality of the record clearly demonstrated that the parents' current lack of acknowledgement and/or insight of the role that they played, be it actively or passively, had not been remedied at the time of the termination proceeding and this [c]ourt lacked any confidence that either parent would quickly progress towards such remedy.

Trial Court Opinion, 6/20/19, at 16-18 (some citations to the record omitted).

Our review of the record supports the trial court's conclusion. Dr. Wolford, an attending physician in the Division of Child Advocacy at Children's Hospital of Pittsburgh (CHP), testified regarding Child's injuries and care. N.T., 4/8/19, at 40-41. Dr. Wolford testified that Parents brought Child to CHP when she was eight weeks old. *Id.* at 45-46. Child had a large hematoma on her ear, a bruise on her face, a torn frenulum, 24 broken ribs, and healing fractures of the left tibia and fibula. *Id.* at 43-44, 75. Dr. Wolford opined that Child could not have caused the injuries herself. *Id.* at 44. Further, because Child's injuries consisted of tissue injuries and bone injuries, Dr. Wolford did not believe a single disease would account for both types of injuries. *Id.* at 46. Instead, Dr. Wolford opined that the injuries were the result of physical abuse. *Id.* Additionally, Dr. Wolford believed that Child was likely abused on more than one occasion, and if Child were to return to the

- 10 -

violent environment, she was at risk for continued injury and even death. *Id.* at 48-50.

Dr. Wolford spoke with Parents regarding her belief that Child suffered abuse, but Parents were more interested in testing for bone diseases and discussing various bone diseases. *Id.* at 69-70. Further, the medical records described a "flat affect" for Parents, and neither parent interacted with Child or looked at her. *Id.* at 76-77. Mother had no emotion when shown Child's x-rays, and when told that someone hurt Child, Mother showed no emotion and had no questions. *Id.*

Dr. Wolford further observed that Child was small and had not been gaining weight, but once she was removed from Parents' care, Child started to heal and gain weight. *Id.* at 46-47. Dr. Wolford emphasized that Child's low weight was successfully treated by placing her in a safe environment. *Id.* Although Parents suggested a bone disease may have caused the fractures, Dr. Wolford rejected the suggestion, noting that Child had tissue injuries that were not bone related, the fractures healed normally, and Child did not have any new fractures after she was placed out of her family's care. *Id.* at 53-57. Similarly, Dr. Wolford opined that Child's broken bones did not arise from Child's birth. *Id.* at 68-69.

Dr. Wolford summarized her concern:

[I]f you don't make changes, this child is going to end up in my ICU with an abusive head trauma and die[,] or there's the risk for that, I should say.

> And so while that is -- somebody could say that that is an estimate or a guess. The truth is that research shows us that is a risk, and I make that statement so that we can understand the gravity of the danger that this eight-week old, who has 24 rib fractures, a torn mouth and a torn ear is living in.
>
> ***
>
> So if we don't make intervention, if there isn't rehabilitation to develop coping skills, if there isn't an acknowledgement, an awareness that there's been violence, then we've done nothing to change this child's environment and thereby she remains at all of that risk.
>
> So I am one piece of a multi-moving part system, but part of the reason that my dialogue with the family and the part that I tried to do to ensure [Child]'s safety is to make sure there's absolute clarity that this child has been the victim of abuse, that she has been -- that this eight-week old enduring 24 rib fractures and multiple skin and face injuries was the victim of abuse on more than one occasion, and if the adults in her life cannot acknowledge that and be willing to work towards safety to ensure that she doesn't end up injured again, then we -- then as a pediatrician, I will tell you I have a difficult time sleeping because I haven't done my job to make sure that there is an acknowledgement that we have to do better for this kid.

*Id.* at 50-52.

Dr. Wolford rejected the notion that Parents' pleading guilty amounted to an acceptance of responsibility, noting, "I think it's fair to say that we all acknowledge that pleading guilty to different charges in no way is a way to assume that there is acknowledgment . . . ." *Id.* at 58.

Detective Daniel Honan testified regarding his investigation of Child's injuries. His investigation revealed that Child's ear injury was caused within 24 hours of Parents' bringing Child to the hospital, and that Parents were the only caregivers during that time period. *Id.* at 13-14. Further, he determined that Parents cared for Child for all but 11 hours of her life. *Id.* Mother had

- 12 -

no explanation for the injuries, speculating they may have been caused by a bone disease or Child tugging at or sleeping on her ear. *Id.* Father claimed the injuries were the result of a metabolic bone disease. *Id.* The detective described Mother's reaction as "flat" and emotionless, while Father's reaction was more animated, although both parents questioned the validity of what the doctors reported. *Id.* at 16. The detective noted that Child suffered no new injuries after she came into care. *Id.* at 17. Further, Father ultimately pled guilty to endangering the welfare of children and Mother pled no-contest. *Id.* at 13.

Samantha Holtz, a CYF caseworker, testified that CYF received a Child Protective Services (CPS) report regarding Child's injuries, and then interviewed Parents, who had no explanation for the injuries. *Id.* at 168. Parents only identified themselves, the maternal grandparents, and Father's stepfather as caregivers for Child. *Id.* Child was discharged from the hospital to her maternal grandparents pursuant to an emergency custody authorization. *Id.* However, Child was removed from the maternal grandparents on June 23, 2017, because of allegations of domestic violence between the maternal grandparents, the maternal grandparents allowed Mother to visit Child, and CYF determined that Child spent more time with the maternal grandparents prior to her injuries than originally indicated. *Id.* at 169. Accordingly, in June 2017, CYS moved Child to her current foster home. *Id.* On July 21, 2017, Child was adjudicated dependent. *Id.* at 190.

Mother's goals were to resolve her criminal matter, complete and attend parenting and non-offender classes, comply with CYF and service providers, and attend a program addressing domestic violence. *Id.* at 173-74. Father's goals were to resolve his criminal matter, obtain his GED, comply with CYF and his probation, attend parenting and domestic violence programs, and attend visits. *Id.* at 181. Ms. Holtz confirmed that the goals were established to fully address Parents' incapacity. *Id.* at 174, 199.

Ms. Holtz testified that Mother's participation and cooperation was substantial, and that Mother did what was asked. *Id.* at 173-79. Further, Mother attended Child's medical appointments and interacted well with Child's foster parents. *Id.* at 180. Mother visited Child three times per week. *Id.* at 179. Ms. Holtz acknowledged that there was never a specific goal to explain how the injuries to Child occurred. *Id.* at 208.

With respect to Father, Ms. Holtz described his compliance and progress as minimal to moderate. *Id.* at 181. Ms. Holtz expressed concerns about Father's parenting because he was slowly learning, and although he made progress, there was no explanation for Child's injuries. *Id.* at 182. However, Ms. Holtz agreed that Father was generally compliant with his goals, except for the time-period when Father moved to Florida between August 2018 and October 2018. *Id.* at 183-84, 190-196. Ms. Holtz further testified that Father attended the majority of Child's medical appointments and Father's parenting improved. *Id.* at 194.

Ms. Holtz testified that although Parents were compliant and making progress, CYF sought to terminate their parental rights because neither offered a satisfactory explanation for Child's injuries. *Id.* at 188-89, 196. Without a plausible explanation for how Child was injured, CYF could not ensure Child's safety in Parents' care. *Id.* at 172. Further, Ms. Holtz testified that there were no additional services CYF could provide to remedy the condition. *Id.* at 188.

Father testified that he was meeting the goals established by CYF. *Id.* at 213-16. Further, Father obtained employment and was working toward his GED. *Id.* at 216-17. With respect to Child's injuries, Father testified, "I don't exactly know how it happened[,] but something definitely happened." *Id.* at 213.

Father's service providers confirmed his progress. Kelly Hindman, a Holy Family visit coach for Father, testified that Father did well, followed instructions and suggestions, cooked meals, and engaged with Child. *Id.* at 149-51. Father's schedule prevented him from attending visit coaching at the time of the hearing, but Father was able to meet his goals at visitations. *Id.* at 151-52. Gerald Paris, Jr., Father's probation officer, similarly testified that Father made progress with respect to his probation, abstained from drugs and alcohol, took 17 negative drug tests, completed aggression replacement therapy, obtained employment, and worked toward his GED. *Id.* at 26-27.

Mother also offered testimony asserting that she believed Child's leg fractures occurred during birth. *Id.* at 230. However, Mother testified that she no longer believed the other injuries were genetic, stating, "I understand after everyone said it's something, something -- someone physically hurt her." *Id.* at 251. However, she still had no explanation. *Id.* at 252. With respect to her no-contest plea, she explained, "I wasn't trying to take to deal with [*sic*] because I wasn't trying to plead any type of guilty, whatever, but it was either that or I pled to a Felony 3 charge, and he said the worst I could -- the easiest I could get with that was years in jail and I wouldn't want to go to jail and miss out on my kid's life." *Id.* at 249-50. Mother contended that she had matured and gained insight, and that she did everything that was asked of her. *Id.* at 239-41, 248-49.

Terry O'Hara, Ph.D., testified regarding psychological evaluations he conducted in April 2018, and March and April 2019. *Id.* at 91-92. During the evaluations, neither parent stated that they knew what happened to Child, nor did they have an explanation for Child's injuries. *Id.* at 105. Father initially questioned whether Child was actually abused, but during the most recent evaluation, acknowledged, "something did happen." *Id.* However, Father claimed he had no idea what happened, while minimizing the time he spent with Child, despite Mother's assertion Father was present half of the time. *Id.*

Dr. O'Hara noted that Child did well in Mother's care and Mother made progress. *Id.* at 110, 124-25. Dr. O'Hara also observed that Child did well in

Father's care, and that Father's parenting skills improved. *Id.* at 120-21.

While Dr. O'Hara believed that Child would benefit from having more time with

Mother, he expressed reservations because Child sustained life-threatening

injuries while in Parents' care and there was no explanation for the injuries.

*Id.* at 110. Further, Dr. O'Hara expressed concern regarding Father's risk

factors for violence and believed Father's visits with Child should be

supervised. *Id.* at 107-09.

Dr. O'Hara testified that Parents needed to acknowledge the severity of

the injuries to Child. *Id.* at 110-11. While both parents acknowledged Child's

injuries, neither recognized that the injuries were extensive and substantial.

*Id.* at 111. This was particularly concerning because Parents failed to

acknowledge that Child was at risk of death from her injuries. *Id.* Moreover,

because Parents could not explain the injuries to Child, there could be no

accountability,[4] and thus, no ability to sufficiently address the issues that led

to Child's injuries. *Id.* at 96-97. Dr. O'Hara considered Parents' insight and

judgment to be very poor. *Id.* at 98. Dr. O'Hara summarized his opinion as

follows:

> I think I testified to this earlier. If there's no accountability to
> [Child's] injuries, which were very significant and extensive and a
> physician has indicated that she's at risk of death if she were to
> return to the environments where she sustained these injuries, if

---

[4] Dr. O'Hara acknowledged that both parents pled guilty to criminal charges, observing that "reflects a partial responsibility, but in no way any sort of comprehensive responsibility for what happened to [Child]." N.T., 4/8/19, at 97.

- 17 -

there's been no accountability to this, there's no way to address the underlying issues, which would have constituted or contributed to [Child's] injury.

*Id.* at 104-05.

Upon review, the record substantiates the trial court's conclusion that Parents' repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Here, Parents cannot or will not remedy their incapacity as it pertains to the gravity of Child's injuries. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we therefore need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

Next, we consider whether Child's needs and welfare will be met by termination pursuant to Section 2511(b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use

- 18 -

expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). A parent's abuse and neglect are likewise relevant to this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through

- 19 -

the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). We have stated, "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

With respect to Section 2511(b), Father contends that the testimony established that there would be "some psychological detriment" to Child if her bond with Parents were severed, and that Child interacted well with Father. Father's Brief at 27-28. Father faults the trial court for focusing on Dr. O'Hara's testimony that although Child would suffer "some psychological detriment" if Father's parental rights were terminated, Child's relationship with her foster parents would mitigate the loss of the relationship with Father. *Id.* at 28. Father contends that the court's reasoning improperly elevates Child's relationship with her foster parents to a basis for terminating Father's parental rights. *Id.* Father argues that the fact Child may be better off with her foster parents is an insufficient reason to terminate his parental rights. *Id.* at 29-31. Father also contends "[t]here are many less penal options which would

permit the child to maintain her bond with the foster parents as well as her bond with her father." *Id.* at 29. Father analogizes this case to a custody case, contending "the parent with the stronger bond may be awarded primary custody[,]" but the noncustodial parent would still be permitted to see "his/her child again. . . ." *Id.*

Similarly, Mother contends that the trial court erred in terminating her parental rights pursuant to Section 2511(b) because Mother and Child share a bond, and the termination of Mother's parental rights would be detrimental to Child. Mother's Brief at 22-23. Mother highlights testimony from Dr. O'Hara that Child would benefit from spending more time with Mother. *Id.* at 23. Mother also argues that Child should be protected from the psychological detriment of losing Mother by restoring Mother's parental rights. *Id.*

In concluding that termination of Parents' parental rights was in Child's best interest, the trial court noted testimony from the CYF caseworkers that Child is happy and well cared for in her foster parents' home, and that there is a bond between Child and her foster parents. Trial Court Opinion, 6/20/19, at 20. The court further observed that while Dr. O'Hara noted positive interactions between Child and Mother and Father, he also testified that Parents continued to show poor insight and judgment. *Id.* at 21. The court referenced Dr. O'Hara's testimony that there would be a detriment to Child if Parents' rights were terminated, but that the relationship Child shares with

her foster parents would mitigate any harm to Child. *Id.* Ultimately, the court concluded:

> [T]he Court was within its discretion when it determined that severing [Child]'s bond with Mother or Father would not cause extreme emotional consequences for the child, and any negative consequences would be mitigated by the strong, healthy and secure bond that [Child] had established with the foster parents that she had resided with most of her entire life. Therefore, the evidence established that termination will be able to provide [Child] with much needed stability and permanence at her young age and this [c]ourt concludes that the developmental, physical and emotional needs and welfare of Child would be best served by terminating Mother's and Father's parental rights.

*Id.* at 21-22.

Our review of the record supports the trial court's conclusion. For example, Wendy Lyons, a CYF caseworker, testified to visiting Child in the foster home, and observing Child to be very comfortable and secure there. N.T., 4/8/19, at 161. Ms. Lyons testified that Child interacts well with her foster parents and their biological children, and has a strong attachment to them. *Id.* at 161-62. Ms. Holtz observed that Child is bonded with her foster parents and their children, and is happy in their home. *Id.* at 187. Further, Child's foster parents are a pre-adoptive resource. *Id.* Although Ms. Holtz expressed concern about the impact to Child of terminating Parents' parental rights, she explained that CYF requested termination to assure Child's safety. *Id.* at 189.

Mother testified that she had no concerns regarding the care the foster parents provide Child, and recognized Child has a good relationship with her

foster family. *Id.* at 243-44. However, Mother also testified to having successful unsupervised visits with Child in which she picks Child up in the morning and goes home. *Id.* at 242. She makes lunch for Child and they eat and play before going out, returning for bath time before Mother returns Child to her foster parents. *Id.*

Father testified that Child always smiles when she sees him and is happy to see him. *Id.* at 220. Father cooks for Child, and he also reads to her. *Id.* at 220.

Consistent with the foregoing, Dr. O'Hara opined that Child interacted well with Parents, and would suffer "some psychological detriment" from termination; however, he also opined that the detriment would be mitigated by Child's relationship with her foster parents, who demonstrated "very good parenting skills" and with whom Child has a secure relationship. *Id.* at 112-13, 144. Further, Dr. O'Hara noted that Child was interactive, engaging, calm, and relaxed with her foster parents. *Id.* at 113-14.

The testimony credited by the trial court support's its conclusion that it would best serve the needs and welfare of Child to involuntarily terminate Parents' parental rights pursuant to Section 2511(b). Contrary to Parents' arguments, the court considered Child's bond with Parents, as well as Child's relationship with her foster parents. Preserving Parents' parental rights would serve only to deny Child the permanence and stability to which she is entitled. *See In re Adoption of C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be

in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). See also Trial Court Opinion, 6/20/19, at 21-22 ("the evidence established that termination will . . . provide [Child] with much needed stability and permanence at her young age . . .". Accordingly, the trial court did not err in terminating Parents' parental rights to Child pursuant to Section 2511(a)(2) and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/06/19